**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **TAMIE D. STEARNS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05 CV 156 CDP (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Tammie D. Stearns for Disability Insurance Benefits under Title II of

the Social Security Act. The cause was referred to the undersigned United States Magistrate

Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a

Brief in Support of Complaint. (Document Number 9). Defendant has filed a Brief in Support of

the Answer. (Doc. No. 11).

**Procedural History**

On February 23, 2004, plaintiff filed her application for Disability Insurance Benefits,

claiming that she became unable to work due to her disabling condition on February 20, 2004.

(Tr. 54-56). This claim was denied initially, and following an administrative hearing, plaintiff's

claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated May 25,

2005. (Tr. 34-37, 14-21). Plaintiff then filed a request for review of the ALJ's decision with the

Appeals Council of the Social Security Administration (SSA), which was denied on August 1,

2005.  (Tr. 5, 2-4).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on December 7, 2004.  (Tr. 142).  Plaintiff was present and was unrepresented.  (Id.).  The ALJ began by advising plaintiff of her right to be represented by counsel at the hearing.  (Id.).  Plaintiff testified that she was aware of her right to counsel.  (Id.).  The ALJ stated that he would allow plaintiff additional time in which to consult with an attorney.  (Id.).  The ALJ further stated that he would give plaintiff a listing of attorneys, some of which provided free or low-cost services.  (Tr. 143).  Plaintiff testified that she wished to proceed without an attorney.  (Tr. 143-45).  The ALJ asked plaintiff if she wished to waive her right to have an attorney present at the hearing.  (Tr. 145).  Plaintiff testified that she wished to waive her right to an attorney.  (Id.).  The ALJ explained the hearing procedure to plaintiff. (Tr. 145-46).  Plaintiff stated that her sister planned to testify.  (Tr. 146).

The ALJ then examined plaintiff, who testified that she was born on September 2, 1961, weighed 210 pounds, and was five-feet, five-inches tall.  (Tr. 147).  Plaintiff stated that she had been gradually gaining weight over the past four years, due to limited activity.  (Id.).  Plaintiff testified that her normal weight is about 170 pounds.  (Id.).  Plaintiff stated that her doctors have advised her to lose weight but have not recommended a particular diet or exercise program. (Tr. 148).

The ALJ indicated that the medical records in the file end in August of 2003.  (Id.).  Plaintiff testified that she saw Dr. Kenneth Asher and Nova Crawford after this time,

approximately four to five months prior to the hearing. (Id.). Plaintiff stated that she saw Mr. Crawford, a family nurse practitioner, for pain in her left hip. (Tr. 149). Plaintiff testified that Mr. Crawford prescribed medication and administered a cortisone injection in her hip. (Id.). Plaintiff stated that she saw Dr. Asher, her regular family doctor, a few weeks after she saw Mr. Crawford, for treatment of eczema on her feet. (Tr. 15).

Plaintiff testified that she is married and that she does not have any children. (Tr. 151). Plaintiff stated that she has a valid driver's license and that she regularly drives short distances. (Id.). Plaintiff testified that her right knee cramps when she drives distances longer that about eight miles. (Id.). Plaintiff stated that she does not drive any farther than Cape Girardeau, which is about a fifteen-minute drive. (Tr. 151-52). Plaintiff testified that she drives 50 to 75 miles in an average month. (Tr. 152). Plaintiff stated that her sister drove her to the hearing because she prefers not to drive. (Id.).

Plaintiff testified that she stopped working at her position at a nursing home on February 20, 2004, because she was laid off due to a low number of residents and her inability to perform her job. (Id.). Plaintiff stated that she brought letters from her former supervisor and administrator to admit to the record. (Tr. 153).

Plaintiff testified that she was involved in an automobile accident in October of 1999. (Id.). Plaintiff stated that she filed a claim with regard to the accident, which settled in October of 2003. (Id.). Plaintiff explained that her portion of the settlement was $300,000.00, after paying attorney fees and costs. (Tr. 154). Plaintiff testified that she had medical bills resulting from the accident. (Id.). Plaintiff stated that she underwent nine surgeries. (Id.). Plaintiff testified that she underwent four surgeries on her right ankle, four surgeries on her right knee, and one surgery

on her left wrist.  (Id.).  Plaintiff stated that the last surgery, a right knee replacement, took place in 2002.  (Id.).  Plaintiff testified that she was out of work for four months immediately following the accident.  (Id.).  Plaintiff stated that she underwent three surgeries during this time.  (Id.).  Plaintiff testified that she was out of work an additional four months following the knee replacement surgery.  (Id.).  Plaintiff indicated that she took vacation and sick leave for the remaining surgeries.  (Id.).

Plaintiff testified that she alleged an onset of disability of February 20, 2004, due to an increase of pain in her leg and hip she experienced at that time.  (Tr. 155).  Plaintiff stated that the pain is in her left hip, left knee, and right leg.  (Id.).  Plaintiff testified that she underwent four surgeries to the right knee.  (Id.).  Plaintiff stated that two of the surgeries were arthroscopic and two of them were invasive.  (Id.).  Plaintiff testified that she does not wear a brace or support of any kind.  (Id.).  Plaintiff stated that the last time she wore a brace was before she underwent knee replacement surgery in 2001.  (Tr. 156).

Plaintiff testified that she also experiences back pain because she overuses her back to compensate for her leg impairments.  (Tr. 156-57).  Plaintiff stated that she underwent x-rays of her back, which did not reveal any abnormalities.  (Tr. 157).  Plaintiff testified that she has not received any treatment for her back in the last year to two years.  (Id.).  The ALJ requested the updated medical records from Mr. Crawford and Dr. Asher.  (Id.).  The ALJ stated that he would keep the record open for approximately four weeks, so that plaintiff could obtain these records.  (Tr. 158).

Plaintiff testified that she graduated from high school and completed one year of vocational school to obtain her LPN.  (Tr. 158-59).  Plaintiff stated that she received an LPN

license.  (Tr. 159).  Plaintiff testified that she worked as a housekeeper, and not as an LPN, at the nursing home.  (Id.).  Plaintiff stated that she worked as an LPN for about eight years, until 1995. (Id.).  Plaintiff testified that she is able to read and write.  (Id.).

Plaintiff stated that she is able to stand for about fifteen minutes before she begins to experience severe pain in her right knee, right ankle, and left hip.  (Tr. 159-60).  Plaintiff testified that she can sit in a straight-back chair for about a half-hour before she experiences discomfort. (Tr. 160).  Plaintiff stated that she can sit for about 45 minutes before she has to stand and move around.  (Id.).  Plaintiff testified that cannot squat or stoop, she can bend halfway from a standing position, and she can bend almost to the floor from a sitting position.  (Id.).  Plaintiff stated that she can walk on flat ground for about 20 minutes before she has to sit down and rest due to pain in her right ankle, right knee, and left hip.  (Tr. 161).  Plaintiff testified that she can lift about 20 pounds using both hands.  (Id.).  Plaintiff stated that she can carry 10 to 15 pounds from one end of the room to the other.  (Id.).  Plaintiff testified that she is able to walk up and down stairs slowly if she can hold on to handrails.  (Id.).

The ALJ next asked plaintiff to describe a typical day.  (Tr. 162).  Plaintiff testified that she usually goes to bed at about 10:00 p.m. and wakes up at about 5:00 a.m.  (Id.).  Plaintiff stated that she usually wakes up at least once during the night and walks around to stretch her legs.  (Id.).  Plaintiff testified that she usually stays up for about a half-hour and then goes back to sleep.  (Id.).  Plaintiff stated that when she wakes up in the morning, she moves around for a while and then watches television.  (Id.).  Plaintiff testified that she either lies down on the couch or sits in her recliner with her legs propped.  (Tr. 162-63).  Plaintiff stated that she prepares dinner when her husband gets home at around 3:30 p.m.  (Tr. 163).  Plaintiff testified that she and her husband

then watch television.  (Id.).  Plaintiff stated that she and her husband go to Wal-Mart for groceries as needed.  (Id.).  Plaintiff testified that her husband works at Havco, which is a company that manufactures wood products.  (Id.).

Plaintiff testified that she does not attend church or belong to any kind of organization or club.  (Tr. 164).  Plaintiff stated that she belonged to the Jaycees until she turned forty and was no longer eligible to be a member.  (Id.).  Plaintiff stated that she crochets doilies and sews shirts as hobbies.  (Id.).  Plaintiff testified that she crochets about once or twice a year and she sews once or twice a week.  (Tr. 165).  Plaintiff stated that she usually sews for a couple hours at a time, with breaks.  (Id.).

Plaintiff testified that she does housework on the main level of her two-story home.  (Id.).  Plaintiff stated that she vacuums, mops, does the laundry, cooks, washes dishes, and shops for groceries.  (Tr. 166).  Plaintiff testified that she and her husband go out to eat on the weekends and visit friends once or twice a week.  (Tr. 167).  Plaintiff stated that she usually goes to her sister's house to visit.  (Id.).  Plaintiff testified that she and her husband also have friends over at their home.  (Id.).  Plaintiff stated that when she visits with friends, they usually play cards.  (Id.).  Plaintiff testified that she smokes about one package of cigarettes a day and drinks one alcoholic beverage about every two weeks.  (Tr. 168).

Plaintiff testified that she has never had a job that involved sitting the majority of the work-day.  (Id.).  Plaintiff stated that she has worked in nursing homes her whole life.  (Id.).  The ALJ asked plaintiff whether she could work at a job for eight hours a day that permitted her to sit and stand alternately at her convenience; that would not require her to stand more than 15 minutes at a time, sit more than 45 minutes at a time, walk more than 20 minutes at a time, lift

more than 20 pounds or carry more than 15 pounds; with no bending, stooping, regular ascending or descending of stairs; and with limited bending. (Tr. 168-69). Plaintiff testified that she would be able to work at such a position. (Tr. 169).

The ALJ next examined plaintiff's sister, Tina Terry, who testified that she agreed with most of the things plaintiff said at the hearing. (Id.). Ms. Terry testified that plaintiff stated her limitations clearly and that plaintiff is significantly limited in what she can do. (Tr. 169-70).

The ALJ then examined the vocational expert, Dr. John Grenfell. (Tr. 170). The ALJ asked Mr. Grenfell whether a hypothetical individual with plaintiff's age, education, training, past relevant work experience and the following limitations could perform any jobs: lift up to 10 pounds, carry 10 to 15 pounds, requires an alternate sit-stand option, cannot stand more than 15 minutes at one time, cannot sit more than 45 minutes at a time, cannot walk more than 20 minutes at a time on flat ground, cannot stoop or squat, cannot bend more than to the mid-calf while standing with the ability to bend to the floor when seated, no regular or frequent stair climbing or descending, and requires handrails when climbing stairs occasionally. (Tr. 170-71). Mr. Grenfell testified that although such an individual would not be able to perform plaintiff's past work with these restrictions, her past relevant work skills would transfer to other types of sedentary and light work. (Tr. 171).

Mr. Grenfell stated that such an individual could work as a health insurance clerk, which is a sedentary job. (Id.). Mr. Grenfell testified that there are in excess of 2,000 people employed as health insurance clerks in Missouri and over 200,000 nationally. (Id.). Mr. Grenfell stated that the individual could also work as an admitting clerk in a hospital, which is a sedentary job. (Tr. 172). Mr. Grenfell testified that there are 800 such jobs in Missouri and 80,000 nationally. (Id.).

Mr. Grenfell testified that the individual could also work as a receptionist in a hospital and that there are 3,000 such jobs in Missouri and 200,000 nationally. (Id.). Mr. Grenfell stated that all of these jobs allow for a sit/stand option. (Id.).

Mr. Grenfell testified that the individual could also work outside the hospital setting as a self-service station attendant or a surveillance system monitor, which are sedentary jobs. (Id.). Mr. Grenfell stated that there are over 2,000 self-service station attendant jobs in Missouri and 60,000 nationally, and that there are over 6,000 surveillance system monitor jobs in Missouri and 110,000 nationally. (Id.).

The ALJ then asked Mr. Grenfell whether plaintiff could perform those jobs if the ALJ found plaintiff's testimony regarding her limitations fully credible. (Tr. 173). Mr. Grenfell testified that plaintiff could perform the jobs he described if she were found to be fully credible. (Id.). Mr. Grenfell noted that plaintiff testified that she could work with restrictions described by the ALJ for eight hours a day. (Id.).

The ALJ concluded the hearing by stating that he would consider the evidence after he received the additional medical records from plaintiff. (Id.).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to Guy H. Frumson, M.D. at Northland Orthopedics for an Independent Medical Examination on October 24, 2002. (Tr. 128-39). Dr. Frumson first summarized plaintiff's medical history. Dr. Frumson noted that plaintiff was involved in an automobile accident on October 4, 1999, which caused her to suffer a left wrist fracture that required open reduction and internal fixation; right knee open compound fracture,

comminution of the patella,[1] which required open debridement, irrigation, removal of the patella, and repair of the extensor mechanism; and 3) fracture of the medial malleolus,[2] which required open reduction and internal fixation. (Tr. 135). Plaintiff underwent surgery on October 4, 1999 and on October 6, 1999. In addition, plaintiff underwent an arthroscopy of her right knee on June 9, 2000, which revealed that she had an absent anterior[3] cruciate ligament,[4] extensive degenerative changes in her knee, an absent patella, and chondromalacia[5] changes of the weight bearing surface of the medial compartment. (Id.). Plaintiff was evaluated by Dr. Gary Schmidt for an anterolateral right ankle impingement syndrome[6] and instability due to a ruptured anterior ligament. (Id.). Plaintiff underwent surgery on July 19, 2000, where Dr. Schmidt performed an ankle arthroscopy and debridement anterolaterally, removed a bony osteophyte,[7] and repaired the lateral ankle ligaments. (Tr. 136). Plaintiff developed some type of infection and cellulitis,[8] was debrided and irrigated, and subsequently improved. (Id.). Plaintiff saw Dr. Jeffrey Martin and

---

[1]Kneecap. Stedman's Medical Dictionary, 1331 (27th Ed. 2000).

[2]A rounded bony prominence on the medial side of the ankle joint. See Stedman's at 1058.

[3]Front surface. See Stedman's at 94.

[4]The two ligaments that pass from the tibia to the femur. See Stedman's at 998.

[5]Softening of any cartilage. Stedman's at 341.

[6]Disorder characterized by back surface ankle pain that occurs in forced plantar flexion. See Stedman's at 1156.

[7]A bony outgrowth or protuberance. Stedman's at 1285.

[8]Inflammation of connective tissue. Stedman's at 317.

underwent a right total knee arthroplasty[9] on September 13, 2001. (Id.).

Plaintiff complained to Dr. Frumson of intermittent dull, aching, pain in the left wrist without swelling, and with weakness and some loss of motion; continuous, dull, aching and intermittent sharp pain in her right knee, with some swelling and weakness; and intermittent dull pain in the right ankle, with swelling. (Tr. 133-34). Upon physical examination, Dr. Frumson found that plaintiff had -10 degrees full extension of the right knee, and 100 degree flexion. (Tr. 134). Palpation of the medial knee joint line was painful, and the lateral joint line had decreased feeling. (Id.). Dr. Frumson noted that plaintiff could not do a knee squat or duck walk and that she experienced difficulty going up and down steps. (Id.). With regard to plaintiff's right ankle, Dr. Frumson found that there was decreased feeling on the lateral three toes and on the lateral three metatarsals up to her surgical scars on her ankle. (Tr. 135). Dr. Frumson noted that plaintiff experienced difficulty standing on the heels on the right side, that she could not do a deep knee bend, and that she could not do a knee squat. (Id.). Regarding her left wrist, Dr. Frumson found that plaintiff could dorsiflex the left wrist 60 degrees and plantar flex it 40 degrees with full pronation and full supination. (Id.). Plaintiff complained of profound weakness in the right leg. (Id.). Dr. Frumson stated that plaintiff limped and held the right leg stiff when she walked. (Id.). Dr. Frumson noted that plaintiff worked a whole day at the nursing home but took frequent breaks to rest the knee, ankle, and wrist. (Id.). Plaintiff reported that she did not feel that she had a difficult time performing her job duties, although she believed her right knee and ankle were getting progressively worse and more limiting. (Id.).

---

[9]Creation of an artificial joint to correct advanced degenerative arthritis. Stedman's at 150.

Dr. Frumson summarized that plaintiff's surgeries have left her with "some lack of range of motion" and lack of strength in the quadriceps mechanism of her knee and ankle. (Tr. 136). Dr. Frumson expressed the opinion that plaintiff had thirty percent disability of the body as a whole due to her right knee; five percent impairment to the body as a whole due to the right ankle; and a three percent disability of the body as a whole due to the left wrist. (Id.). Dr. Frumson stated that plaintiff will likely require another total knee replacement, although she will eventually do well if she continues extensive physical therapy. (Tr. 138). Dr. Frumson concluded that plaintiff's job as a housekeeper was too strenuous for a person with her physical impairments, although she could continue working at a job that was less strenuous on her knee. (Tr. 138-39).

Plaintiff presented to Dr. Jeffrey Martin at the Orthopaedic Center of St. Louis on July 21, 2003. (Tr. 125). Plaintiff complained of weakness and pain with weight-bearing activities. (Id.). Plaintiff reported that she could only walk about a block or two and that she experienced difficulty getting up from a chair. (Id.). Dr. Martin stated that plaintiff had 5 to 115 degrees range of motion. (Id.). Dr. Martin noted that an x-ray taken that day was unremarkable. (Id.). He prescribed quadriceps toning exercises. (Id.).

Plaintiff presented to Southeast Missouri Hospital Outpatient Rehabilitation on July 25, 2003, complaining of right knee pain and weakness. (Tr. 120). Plaintiff reported a constant aching pain, with intermittent stabbing pain, and pins and needles in her right knee. (Id.). Plaintiff indicated that she cannot ascend or descend stairs with her right leg and that she experiences pain with prolonged sitting. (Id.). Plaintiff rated her pain as a five on a scale of one to ten at that time, with pain generally ranging from a three to an eight. (Id.). Upon physical examination, plaintiff demonstrated increased foot pronation bilaterally, significant quadriceps atrophy, and significant

atrophy in the right lower extremity. (Tr. 121). Plaintiff's passive range of motion of right knee extension was -4, flexion 92 degrees, and active right knee extension -6 degrees. (Id.). Plaintiff exhibited an extensor lag with straight leg raise and difficulty with straight leg raises. (Id.). Plaintiff's quad-set quality was noted as poor on the right. (Id.). The physical therapist commented that plaintiff entered the department gaiting independently without an assistive device, with decreased stance time on the right lower extremity. (Id.). The assessment of the physical therapist was: right knee pain and weakness, status post right total knee replacement in 2001. (Id.). Plaintiff's problems were listed as pain, decreased range of motion, decreased strength, limited gait and functional mobility due to pain. (Id.). Plaintiff's rehabilitation potential was described as good. (Id.). The physical therapist recommended that plaintiff be seen three times a week for four to six weeks. (Id.).

The record reveals that plaintiff presented for physical therapy approximately fifteen times from July 25, 2003 to August 22, 2003. (Tr. 114-119). Plaintiff was instructed on exercises. (Tr. 119). Plaintiff reported soreness after her first physical therapy session. (Id.). She was given hot packs and electronic stimulation to the quadriceps of the right knee. (Id.). The therapist noted that plaintiff was lacking several degrees of range of motion. (Id.).

On July 29, 2003, the physical therapist noted that plaintiff was still experiencing difficulty with straight leg raises. (Tr. 118). On July 31, 2003, plaintiff reported that her knee was not quite as painful. (Id.). Plaintiff was given hot packs and electronic stimulation, and was instructed on gait. (Id.). It was noted that plaintiff's right knee/quads were still very weak and that plaintiff limps with gait. (Id.). On August 4, 2003, plaintiff reported that her knee was getting stronger, although her pain stays at about a five on a scale of one to ten. (Id.). The

physical therapist stated that plaintiff's strength was improving and that plaintiff was able to progress with weight-bearing exercises without increasing her pain. (Id.). On August 6, 2003, plaintiff reported experiencing difficulty with stairs, squatting, and walking down inclines due to feelings of instability. (Tr. 117). It was noted that plaintiff had significant wobbling when performing her exercises. (Id.). On August 8, 2003, and August 12, 2003, plaintiff reported feeling stronger yet still having pain at about a five on a scale of one to ten. (Id.). On August 13, 2003, the physical therapist noted that plaintiff tolerated increases in her exercises. (Tr. 116). On August 15, 2003, plaintiff reported feeling better, but noted that she had not been walking much. (Id.). The physical therapist stated that plaintiff progressed with her exercises as tolerated. (Id.). On August 18, 2003, plaintiff reported increased knee pain due to working all weekend. (Tr. 115). The physical therapist noted that plaintiff was slowly progressing with quad strengthening, although her right lower extremity still fatigues easily with squats and lunges. (Id.). On August 20, 2003, plaintiff reported experiencing difficulty with stairs, although she believed she made good progress overall with her knee. (Id.). Plaintiff rated her pain as a five with work activity and no pain at rest. (Id.). Plaintiff indicated that she wished to continue with her rehabilitation program at the fitness facility, and she was instructed on exercises. (Id.). Plaintiff reported only minimal pain after completing her exercises. (Id.). On August 22, 2003, plaintiff stated that she was doing fairly well. (Id.). Plaintiff reported that she still has some pain with prolonged walking or standing but overall she feels she has improved. (Id.). Plaintiff stated that she wished to continue with her exercises on her own. (Tr. 114). The physical therapist indicated that plaintiff's range of motion was 0-118 degrees. (Id.). The therapist concluded that plaintiff did well with rehabilitation and discontinued physical therapy at that time. (Id.).

On May 7, 2004, plaintiff saw Syed Zahoor-Ul-Mueen, M.D. at the Jackson Medical Center, for a physical examination in connection with her application for benefits. (Tr. 107-12). Plaintiff complained of pain in her right knee joint in the morning, stiffness that improves after 10 to 15 minutes of ambulation, shooting pain in right knee joint with prolonged sitting and standing, intermittent numbness and tingling in her right leg, bilateral hip pain with prolonged sitting and standing, and intermittent left wrist pain. (Tr. 107). Dr. Zahoor-Ul-Mueen described plaintiff's gait as slow with slight dragging of right foot, otherwise unremarkable. (Tr. 112). Upon physical examination, plaintiff was found to be well-developed, well-nourished, and in no acute distress. (Tr. 108). Plaintiff had slight impaired sensation surrounding the right knee joint area on anterior aspect. (Id.). Plaintiff has a joint deformity on right knee joint secondary to total knee replacement. (Id.). No obvious swelling on right knee or right ankle was present. (Id.). Plaintiff had minimal muscle atrophy and no muscle spasm. (Tr. 112). Dr. Zahoor-Ul-Mueen's impression was: (1) right knee joint pain with history of right knee, open compound fracture secondary to motor vehicle accident; (2) right ankle pain, most likely related to previous right ankle injury; (3) left wrist pain, previous history of left wrist injury, patient not very symptomatic at this point, patient has occasional pain in left wrist; and (4) history of asthma, with no recent hospitalization or ER visit because of asthma. (Tr. 109). Dr. Zahoor-Ul-Mueen summarized that plaintiff is symptomatic with right knee joint pain and stiffness that is worse with prolonged sitting and standing. (Id.). He stated that plaintiff has difficulty in ambulation because of persistent pain and discomfort of her right knee joint and also pain in the right ankle. (Id.). Dr. Zahoor-Ul-Mueen noted that plaintiff's signs and symptoms are consistent with multiple joint injuries and that

there is a possibility of osteoarthritis[10] because of moderate exogenous obesity, especially lower extremity joint aches and pains. (Id.). Dr. Zahoor-Ul-Mueen expressed the opinion that plaintiff had no obvious limitations in her ability to perform work-related functions. (Tr. 112).

Plaintiff presented to Dr. Kenneth Asher at Jackson Family Clinic on December 14, 2004, requesting a letter confirming she was disabled. (Tr. 106). Plaintiff complained of pain in her right knee and right ankle and indicated that it hurts to stand or sit for long periods of time. (Id.). Plaintiff also complained of pain in her left hip. (Id.). Dr. Asher described plaintiff's gait as "rather awkward." (Id.). He also noted that plaintiff had decreased range of motion in her waist, only being able to flex approximately 70 degrees, and that plaintiff was unable to do a deep knee bend. (Id.). Dr. Asher stated that all of plaintiff's previous surgery scars were well-healed and that the remainder of her exam was unremarkable. (Id.). Dr. Asher concluded that plaintiff had a moderately significant decrease in her range of motion, an abnormal gait, and some stiffness in her knee and ankle. (Id.). He rated her disability at approximately forty percent. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

2.    The claimant met the disability insured status requirements of the Act on February 20, 2004, the date she alleges she became disabled, and continues to meet them through December 31, 2008.

---

[10]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1282.

3.     The medical evidence establishes that the claimant has the following medically determinable "severe" impairments: Right knee joint pain, status post patellar repair and right total knee replacement; right ankle pain; left wrist pain; and asthma, by history.

4.     The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

5.     The claimant's allegations of a total inability to work were not fully credible because of significant inconsistencies in the record as a whole, as discussed more fully in the Evaluation of the Evidence.

6.     The claimant has the residual functional capacity to lift 20 pounds at one time and to carry 10 to 15 pounds, with the need for a alternate sit/stand option, with no requirement to walk more than 20 minutes at one time on flat, level ground, no requirement to stand more than 15 minutes at one time, no requirement to sit more than 45 minutes at one time, with no stooping or squatting, with no bending of more than her mid calf level while standing, with the ability to bend to the floor when seated, with no regular or frequent stair climbing or descending, and, if stair climbing or descending is occasionally required, there must be handrails.

7.     The claimant, born on September 2, 1961, is 43 years old, which is classified as a younger individual.

8.     The claimant has a high school or better education, having completed the twelfth grade, and having earned a license as a L.P.N.

9.     The claimant is able to make a vocational adjustment to jobs which exist in significant numbers in the national economy, based on the credible testimony of the vocational expert, as set out fully in the Evaluation of the Evidence hereinabove.

10.    The claimant is not under a "disability," as defined in the Social Security Act within the framework of Medical Vocational Rules, 202.21 and 202.22.

(Tr. 20-21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application protectively filed on February 15, 2004, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under sections 216(I) and 223, respectively, of the Social Security Act.

(Tr. 21).

**Discussion**

**A.       Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.       The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that he or she has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.**     **Plaintiff's Claims on Appeal**

Plaintiff raises three claims on appeal of the Commissioner's decision.  Plaintiff first argues

that the ALJ failed to fully develop the record.  Plaintiff next argues that the ALJ failed to secure

a valid waiver of counsel from plaintiff during her administrative hearing.  Plaintiff finally argues

that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not

credible.  The undersigned will address each claim in turn, beginning with plaintiff's third claim.

**1.**     **Credibility Determination**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain

and limitation not credible.  Plaintiff specifically argues that the ALJ erred by not properly

considering the Polaski factors in making his determination.  Defendant contends that the ALJ

properly applied the Polaski factors and determined that plaintiff's subjective complaints were not

entirely credible.

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing. 739 F.2d at 1322. In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully

credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 19). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first noted that plaintiff has not sought regular treatment for her impairments. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ next pointed out the fact that plaintiff does not take any prescription pain medication but rather only takes over-the-counter medications for her musculoskeletal pain. A lack of strong pain medication is inconsistent with subjective complaints of disabling pain. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003).

The ALJ noted that plaintiff continued to be quite active despite her allegation of disability. Plaintiff testified that she prepares meals, performs many indoor and outdoor household chores, shops, drives, goes out to eat, and visits with friends. (Tr. 152, 166-67). Plaintiff testified that she drives an average of 50 to 75 miles per month. (Tr. 152). Significant

daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

Finally, the ALJ indicated that he was giving little weight to the December 14, 2004 source statement of Dr. Asher wherein he expressed the opinion that plaintiff had a 40 percent disability rating. The ALJ correctly stated that the Administration's definition of disability does not follow this rating system, and that the rating system is thus of very limited probative value in this matter.[11] Plaintiff contends that the ALJ erred in failing to request additional clarifying information from Dr. Asher regarding his opinion. The Regulations explain that an ALJ is required to contact a treating physician only if the doctor's records are "inadequate for us to determine whether [the claimant] is disabled," such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e), 416.912(e). Dr. Asher's records are not ambiguous. Further, the medical record, along with plaintiff's testimony, provides sufficient evidence for the ALJ to make his decision. As such, the ALJ was not required to obtain additional information from Dr. Asher.

After discussing plaintiff's credibility, the ALJ made the following determination:

---

[11] As noted earlier, Dr. Frumson found plaintiff had thirty percent disability of the body as a whole, due to her right knee; five percent impairment to the body as a whole due to the right ankle; and a three percent disability of the body as a whole due to the left wrist. (See page 10-11 of this Report and Recommendation). The term "body as a whole" is often used in connection with workers' compensation claim assessments of disability, which is different from a Social Security determination of disability. Dr. Frumson found that plaintiff could continue working at a job less strenuous than that of a housekeeper. Dr. Frumson's lengthy evaluation was before plaintiff settled her automobile accident claim and over a year before she filed her Social Security application.

> [a]fter carefully considering all the evidence of the record, the claimant is found credible to the extent of and the claimant's residual functional capacity and limitations are found to be the ability to lift 20 pounds at one time and to carry 10 to 15 pounds with the need for an alternate sit/stand option, with no requirement to walk more than 20 minutes at one time on flat, level ground, no requirement to stand more than 15 minutes at one time, no requirement to sit more than 45 minutes at one time, with no stooping or squatting, with no bending of more than her mid calf level while standing, with the ability to bend to the floor when seated, with no regular or frequent stair climbing or descending, and, if stair climbing or descending is occasional[ly] required, there must be handrails.

(Tr. 20). Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 711-712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In this case, the ALJ's residual functional capacity determination is supported by substantial evidence. No physician expressed the opinion that plaintiff was unable to perform any type of work. Rather, Dr. Frumson indicated that plaintiff's housekeeper job was too strenuous although plaintiff could work at a less strenuous job (Tr. 138-39), and Dr. Zahoor-Ul-Mueen expressed the opinion that plaintiff had no obvious limitations in her ability to perform work-related functions. (Tr. 112). Notably, plaintiff testified that she would be able to perform a job

- 23 -

for eight hours a day with the identical limitations as those set out by the ALJ in his residual functional capacity determination. (Tr. 168-69).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, as long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.     Development of the Record and Waiver of Counsel

Plaintiff argues that the ALJ erred in failing to secure a valid waiver of counsel from plaintiff at the administrative hearing. Plaintiff also contends that the ALJ failed to fully develop the record.

"[T]he administrative hearing is not adversarial in nature, and the ALJ has a duty to develop facts fully and fairly, especially in a case where the claimant is not represented by counsel." Reeder v. Apfel, 214 F.3d 984, 987 (8th Cir. 2000). An ALJ, however, "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Thus, an absence of counsel "does not in itself deprive a claimant of a fair hearing." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994). The Eighth Circuit Court of Appeals has held that lack of counsel does not

affect the validity of an administrative hearing "unless the claimant demonstrates prejudice or unfairness in the proceeding." Heisner v. Secretary of Health, Ed. and Welfare, 538 F.2d 1329, 1331 (8th Cir. 1976). See Cruise v. Harris, 510 F. Supp. 534, 535 n. 2 (W.D. Mo. 1981).

Before questioning plaintiff, the ALJ advised plaintiff that she had a right to be represented by counsel at the hearing. (Tr. 142). Plaintiff indicated that she was aware of her right to an attorney. (Id.). The ALJ stated that he would allow plaintiff additional time in which to consult with an attorney. (Id.). The ALJ further stated that he would provide plaintiff with a listing of attorneys, including those that provided free or low-cost services. (Tr. 143). After the ALJ further explained the purpose of the hearing and the appellate procedure, the following colloquy occurred:

| ALJ: | Now you understand your appeal rights. |
|---|---|
| [PLAINTIFF]: | Yes, I, I understand. I will continue without a lawyer. |
| ALJ: | Okay, you'd like to waive your right to have an attorney? |
| [PLAINTIFF]: | Yes, I waive my right. |
| ALJ: | Okay. Okay. And you wish to proceed without an attorney or representative? |
| [PLAINTIFF]: | Yes. |

(Tr. 145).

The record reveals that plaintiff was properly advised of her right to counsel at the administrative hearing. The ALJ informed plaintiff that he would continue the hearing if plaintiff wished to seek representation, and even offered to provide plaintiff with a listing of attorneys. Plaintiff declined the ALJ's offer and stated that she wished to proceed without representation. Further, plaintiff was advised three other separate times in correspondence with defendant prior to

the hearing that she had a right to counsel at all the proceedings of her case. (Tr. 33, 31, 26-30). See Shepherd v. Chater, 89 F.3d 841 (8th Cir. 1996) (stating that four notices from the Commissioner informing plaintiff of her right to representation in straightforward, simple terms refuted her assertion that she did not adequately waive representation); McKnight v. Shalala, 51 F.3d 277 (8th Cir. 1995) (stating that ten notices to plaintiff were sufficient for him to knowingly waive his right to representation). Plaintiff acknowledged at the hearing that she had been apprised of her right to representation prior to the hearing. (Tr. 142).

Plaintiff also does not demonstrate prejudice or unfairness because the ALJ developed a full and fair record of plaintiff's disability claim. The record shows that the ALJ thoroughly examined plaintiff during the hearing regarding plaintiff's educational background, work history, various medical problems, physical limitations, degree of pain, and daily activities. The ALJ also examined plaintiff's witness and a vocational expert regarding plaintiff's complaints.

Plaintiff argues that the ALJ failed to properly develop the record in three respects: (1) the ALJ failed to obtain medical records from several medical sources; (2) the ALJ failed to properly examine plaintiff's witness, Tina Terry, at the hearing; and (3) the ALJ failed to obtain clarifying information from Dr. Asher. The undersigned has already determined that the ALJ did not err in failing to seek clarifying information from Dr. Asher. There was ample evidence in the record that the ALJ could use in making his determination. As such, the ALJ also did not err in failing to obtain medical records from other providers.

With regard to the ALJ's questioning of plaintiff's witness, Tina Terry, the record refutes plaintiff's claim. The following colloquy occurred at the hearing:

[ALJ]:                    State your name, please.

- 26 -

| [MS. TERRY]: | Tina Terry. |
|---|---|
| [ALJ]: | Louder please. |
| [MS. TERRY]: | Tina Terry. |
| [ALJ]: | Okay.  And you are the sister of Tammy Stearns? |
| [MS. TERRY]: | Yes. |
| [ALJ]: | Okay.  You've heard your sister's testimony.  Do you pretty well agree with most of the things she said? |
| [MS. TERRY]: | It's pretty accurate. |
| [ALJ]: | Is there anything you'd like to add? |
| [MS. TERRY]: | Well, she stated it pretty clearly.  She's pretty limited to what she can do anymore. |
| [ALJ]: | Anything else you'd like to add? |
| [MS. TERRY]: | (INAUDIBLE) |
| [ALJ]: | Okay. |

(Tr. 28-29).  Ms. Terry simply testified that she agreed with plaintiff's testimony.  The ALJ asked Ms. Terry twice if there was anything she would like to add, and Ms. Terry merely stated that plaintiff was limited in her activities.  The undersigned finds that the ALJ adequately questioned Ms. Terry.  Thus, the ALJ fulfilled his duty by developing a full record at plaintiff's hearing.

Accordingly, the undersigned recommends that plaintiff's grounds for relief be denied.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for a Period of Disability and Disability Insurance Benefits under Title II of

the Social Security Act be **affirmed**.


      The parties are advised that they have eleven (11) days, until February 16, 2007, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


Dated this __5th__ day of February, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE